In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3036

MURDOCK & SONS CONSTRUCTION, INC.,

*Plaintiff-Appellant,*

v.

GOHEEN GENERAL CONSTRUCTION, INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99 C 1723—**John Daniel Tinder**, *Judge.*

ARGUED APRIL 6, 2006—DECIDED AUGUST 17, 2006

Before RIPPLE, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Murdock & Sons Construction, Inc. ("Murdock") was the subcontractor in a construction contract. Murdock was to perform all of the masonry work for a maximum security prison for the State of Indiana (the "State"). Unfortunately for Murdock, its union masons did not work nearly as fast as was projected in the original bid, for reasons that were never determined. This resulted in serious delays and cost overruns; however, the State was unwilling to provide Murdock with an extension of time in which to complete the project. Murdock eventually walked off the job and filed the rarely seen

constructive acceleration claim against the general contrac-
tor and the State, as well as two other claims we need not
address. Following a bench trial, the district court ruled
against Murdock on all claims (including a counterclaim by
the general contractor not at issue here). Murdock appeals,
and we affirm.

## I. HISTORY

The State, acting through its Department of Administra-
tion, decided to build a prison near Terre Haute. Goheen
General Construction, Inc. ("Goheen") contracted with the
State to be the general contractor for the construction of
Level VI housing for the prison, to be named the Wabash
Valley Correctional Institution. The prison was to cost the
State $6,970,000. Goheen and the State entered into a
"Standard Agreement for Construction Projects" which also
contained an index entitled "State of Indiana—General
Conditions" (collectively, the "Contract").

At the State's suggestion, Murdock submitted a bid to
Goheen on the masonry subcontract. Goheen only received
three bids, even though it usually would receive between
four and eight. Murdock was awarded the subcontract[1] with
a fixed-price bid of $1,629,825. The other two bids were
around $2,747,000 and $2,475,000, and they did not include
rebar. Calvin Murdock ("Mr. Murdock") was Murdock's
Chairman and CEO. He gave final approval for the bid. The
bid was originally calculated by well-qualified and experi-
enced experts in both engineering and construction.

The prison was to be a maximum security facility. Not
surprisingly, Level VI housing is very dense with masonry.
The plan called for 288 cells, 7 feet by 12 feet, and involved

---

[1] As a result, the Contract applied to Murdock as subcontractor
to Goheen.

small, short walls. Each wall, arranged in a large honeycomb fashion, consisted of individual cement blocks. The blocks were reinforced with both horizontal and vertical rebar every eight inches. The specifications called for continuous grouting with cement, as opposed to the usual mortar. The specifications also required the extensive placement of embeds, which required a significant number of cuts be made in the blocks. Murdock, although experienced, had no previous experience with masonry projects that were reinforced as much as this prison.

Murdock was required to use union masons. It entered into a working agreement with the local union in Terre Haute. The masons would be employees of Murdock, and Murdock could not set any minimum level of productivity. Murdock had worked on four construction projects in Terre Haute in the past, although it never dealt directly with the local union. These projects were not as extensive as the prison.

Murdock began work in January 1992 and almost immediately encountered a serious problem. Typically, a mason can lay 200 blocks a day. Because of the difficulty of this particular project, Murdock had estimated that each mason could lay 150 blocks a day. From the beginning, however, Murdock's masons were only laying 50 blocks a day. Murdock tried to increase productivity. Without going into detail, Murdock reviewed its plans, fired slow workers, provided additional equipment, and modified the construction process. Murdock also hired more masons, increasing its crew to 83, up from the planned 35; when more were hired, productivity increased, but not for very long. Ultimately, Murdock refused to add more manpower because the increased productivity was only temporary. Both Goheen and the State were well aware that construction was progressing slower than planned; they requested, and then demanded, that Murdock pick up the pace to meet the construction deadline.

In August 1992, Murdock formally notified Goheen that it wanted more money and more time. The notice was made pursuant to terms contained in the Contract. Goheen forwarded Murdock's request to the State. In December, the State denied the request, stating any such request must come directly from Goheen. Almost immediately thereafter, Murdock stopped work and left. The masonry work was not done, and the project was ultimately completed 180 days late.

Murdock filed suit, claiming it was entitled to the extension pursuant to the terms of the Contract. Murdock argued the delay was due to either a labor dispute or a cause beyond its control. The district court conducted a bench trial and thereafter ruled in favor of Goheen and the State.

## II. ANALYSIS

"It is well established that following a bench trial, we review the district court's conclusions of law de novo, but will reverse its findings of fact only if they are clearly erroneous." *Petrilli v. Drechsel*, 94 F.3d 325, 329 (7th Cir. 1996); *see Lurie v. Comm'r*, 425 F.3d 1021, 1025 (7th Cir. 2005) (citation omitted); *Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005) (citations omitted). We do not reweigh the evidence or determine the credibility of witnesses. *Sullivan v. Gilchrist*, 87 F.3d 867, 872 (7th Cir. 1996) (citation omitted). The district court's application of legal principles to factual determinations is reviewed only for clear error. *Lurie*, 425 F.3d at 1025 (citing *Pittman v. Comm'r*, 100 F.3d 1308, 1312-13 (7th Cir. 1996)). "[C]onstruction of the terms of a contract ordinarily presents an issue of law for the court," subject to de novo review. *Yockey v. Horn*, 880 F.2d 945, 949 (7th Cir. 1989) (quotations and citation omitted).

Murdock's claim in diversity is based on constructive acceleration. The parties represent that there is no Indiana

case law recognizing or applying a constructive acceleration claim. However, constructive acceleration is recognized in many jurisdictions, and we are of the opinion that such a claim is viable under Indiana law. *See, e.g.*, *Stephan v. Rocky Mountain Chocolate Factory, Inc.*, 129 F.3d 414, 417 (7th Cir. 1997) (citations omitted). "A claim of constructive acceleration ordinarily arises when the [owner] requires the contractor to adhere to the original performance deadline set forth in the contract even though the contract provides the contractor with periods of excusable delay that entitle the contractor to a longer performance period." *Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004). A constructive acceleration claim has five elements:

> (1) [ ] the contractor experienced an excusable delay entitling it to a time extension, (2) [ ] the contractor properly requested the extension, (3) [ ] the project owner failed or refused to grant the requested extension, (4) [ ] the project owner demanded that the project be completed by the original completion date despite the excusable delay, and (5) [ ] the contractor actually accelerated the work in order to complete the project by the original completion date and incurred added costs as a result.

*Sherman R. Smoot Co. v. Ohio Dep't of Admin. Servs.*, 736 N.E.2d 69, 78 (Ohio Ct. App. 2000) (citation omitted); *see Dep't of Transp. v. Anjo Constr. Co.*, 666 A.2d 753, 757 (Pa. Commw. Ct. 1995) ("A constructive acceleration order may exist, when the government unit merely asks the contractor to accelerate or when the government expresses concern about lagging process.").

The parties initially dispute whether Murdock properly requested an extension. Section 8.3.2 of the Contract provided that any "extension of time shall be made in writing to the Designer not more than twenty days after commencement of the delay." The district court found Murdock did not provide a written notice in a timely

manner; therefore, Murdock's claim was waived, according to the district court. For purposes of our analysis, we will simply assume Goheen waived the formal notice requirement, as it was well aware of the problems Murdock was having in getting the masons to work as fast as originally projected. A dispositive shortcoming in Murdock's case, as correctly found by the district court, was the fact that Murdock was not experiencing "an excusable delay." Such a showing is required, as it comprises the first element in a constructive acceleration claim.

Section 8.3.1 of the Contract provided: "If the Contractor is delayed at any time in the progress of the Work . . . by labor disputes . . . or any causes beyond the Contractor's control . . . , the Contract Time shall be extended by Change Order of such reasonable time as the Designer may determine." Murdock did not establish that the slower-than-anticipated pace of the masons was due to either a labor dispute or a cause beyond its control.

First, Murdock concedes it introduced no evidence at trial indicating why the masons were not working as fast as projected. In its opening brief, Murdock stated, "[T]he reason for the slow down was never determined." Furthermore, "[Murdock] was never able to ascertain the reason for the horrendous labor slow down [it] encountered." By not introducing any evidence of the underlying reason, other than pure conjecture, Murdock certainly faces an uphill battle in establishing that the masons' pace was due to either a labor dispute or a cause beyond Murdock's control. Murdock cannot meet its burden without pointing to a specific cause. Such a showing is required under the contract so that the State (or a court) could determine whether that cause was within Murdock's control.

Second, Murdock argued before the district court, based solely on speculation, that the delay of its work was caused by a labor dispute with the masons. Murdock references

this argument in passing in its briefs before us, but provides no argument in support. As a result, the argument is deemed waived. *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived.") (citations omitted). In any event, we have considered the argument made before the district court and at oral argument, and conclude Murdock did not introduce any evidence of a labor dispute.

As the district court pointed out, Mr. Murdock believed there was a labor dispute because he did not receive a fair day's work from the union masons in return for a fair day's pay. There was also witness testimony indicating there was an organized work slowdown by the masons. The alleged slowdown was an effort to force more masons to be hired for the job, as well as to extend the length of the project to collect more wages. Mr. Murdock testified the masons were "extending their employment at [his] expense." That having been said, this testimony was nothing more than pure speculation.

The testimony was offered by Mr. Murdock himself, Melvin Reed (an officer and employee of Murdock), and Maxie Bolden (a job supervisor). Mr. Murdock testified in a deposition that he had "no clue, really" of the cause of the problem with productivity. Later in that same deposition, when asked about the underlying cause, he stated, "I can speculate, but it would be purely speculation." At trial, Mr. Murdock unequivocally agreed with this previous testimony, and further stated, "We're still speculating [today]." Reed's testimony was no more enlightening. He stated, "[W]e never came up with a reason of why their production was one-third normal. Except I can speculate if you want me to." Finally, Bolden testified, "Yes, I was speculating. I also think it was a good speculation." Given that the witnesses' opinions were nothing more than guesswork, we will not find as clearly erroneous the district court's finding that Murdock did not prove the existence of a labor dispute.

Even assuming the masons consciously slowed their pace in an effort to make more money, we will not substitute Mr. Murdock's definition of "labor dispute" with its legal one. The Norris-LaGuardia Act, 29 U.S.C. § 113(c), defines "labor dispute" as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." Indiana's Anti-Injunction Act, Ind. Code § 22-6-1-12(c) (2006), uses an identical definition. In this case, there was no evidence of a controversy between Murdock and the masons concerning the terms or conditions of employment, or concerning the association or representation of the union. Also, no written grievances or complaints were ever lodged against Murdock. Under these circumstances, there was no evidence of a labor dispute. *See Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 336 (1938) ("'The term 'labor dispute' includes any controversy concerning terms or conditions of employment,' etc. In this case, there was no interchange or consideration of conflicting views in respect of the settlement of a controversial problem.") (Butler, J., dissenting).

Third, Murdock argues the delay in the progress of its work was due to a cause beyond its control. Here again, we are unsure how Murdock can even make its case, as there was no evidence establishing what the cause was, only unsupported speculation. Therefore, we are in the same situation that the district court found itself in: We are unable to determine whether this unknown cause was within Murdock's control or not. This is a recurring (and fatal) flaw in Murdock's case.

The real crux of Murdock's argument before us is that every "management technique or effort" that it tried failed to speed up the masons' pace; therefore, the slow progress

was outside of Murdock's control. There are two problems with this argument. First, it is undisputed that when Murdock added more masons to the job, productivity increased, albeit only for a short time. Murdock even admits that "[t]he only way to increase block count was to add more and more manpower." But Murdock did not continue with the method due to its cost. The fact that productivity could be increased by adding manpower obviously undermines Murdock's argument that nothing that it tried worked.

Second, Murdock did not try everything. For example, Murdock never offered cash bonuses to the masons for completing their work faster or on time. If the masons were indeed slowing things down in an effort to make more money, then perhaps a cash incentive would have done the trick. The point is that we are not sympathetic to Murdock's argument, as Murdock did not try an obvious "management technique or effort" that dealt directly with its perceived root of the problem.

Murdock's legal argument is "that the labor problem was beyond Murdock's control [and] is akin to the concept of foresee [sic] majeure." Murdock argues its bid process was thorough and conducted by experienced professionals. Murdock reasonably relied on historical data and industry standards in compiling its bid. The bid even allowed for normal construction risks and "had substantial amounts built in to allow for reasonably related anticipated productivity challenges." Therefore, Murdock argues it could not have anticipated the construction delays caused by "the horrendous degree of departure from foreseeable levels of mason productivity," as Murdock exercised "the most cautious of due care."

"A force majeure clause is not intended to buffer a party against the normal risks of a contract." *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 275 (7th Cir. 1986). In preparing its bid, Murdock was aware that the

masons' pace could be lower than anticipated. Murdock understood and accepted this risk. In fact, Murdock's estimators understood that the most difficult estimate to make is for labor productivity and that it is a "calculated guess." Murdock also knew it would have to use masons from the local union, and that as a result, it could not set minimum production levels for the masonry work. Furthermore, Murdock was contractually responsible for the conduct of its own employees, which included the masons. And, Murdock arrived at a productivity estimate which was three times the actual.

In the end, while clerical or arithmetic errors are legitimate reasons to obtain relief from an inaccurate bid, mistakes of judgment are not. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 198 (7th Cir. 1993); *Mid-States Gen. & Mechanical Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 435 (Ind. Ct. App. 2004). Unexpected difficulties in the performance of a construction contract do not relieve a contractor from its obligations or serve as justification for more time or money to perform. *Allied Structural Steel v. State*, 265 N.E.2d 49, 55 (Ind. Ct. App. 1970) (explaining "as a matter of custom and practice, the contractor incurs the risk of the unexpected" and "[p]erformance is not excused by a mere inability to perform, by the fact that the contract causes hardship[,] is burdensome, or unprofitable") (citation omitted). Therefore, the district court was correct when it determined that the force majeure clause "[did] not provide Murdock an opportunity for more time and more money because of a risk of labor productivity which Murdock assumed during the formation of the [Contract]."

The reason the masons were not able to perform as anticipated may never be known. Our own review of the record shows the job required more know-how and manpower than projected. The prison was more difficult to build than the usual building with four straight walls. Each wall

required special reinforcements (it was a maximum security facility, after all), and there were many separate walls being built in a large honeycomb. Due to the nature of the facility, the masons were working in small spaces, separated from each other while they were working. In the end, even assuming Murdock's speculation was correct, the burden was on it to develop this factual matter, and we cannot say that the district court's determination that Murdock failed to do so was clearly erroneous. Murdock's estimate grossly understated the amount of time and effort required to perform the masonry work for a unique project, a risk that falls squarely on the shoulders of the subcontractor.

## III.  CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*